# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1083

CHRISTOPHER MOSLEY,

*Petitioner-Appellee,*

*v.*

MIKE ATCHISON, Warden,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:05-cv-00248—**Joan B. Gottschall**, *Judge.*

ARGUED JUNE 5, 2012—DECIDED AUGUST 6, 2012

Before BAUER, ROVNER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Following a bench trial, petitioner-appellee Christopher Mosley was found guilty of first-degree murder and aggravated arson. He was sentenced to consecutive prison terms of 60 years on the murder charge and 15 years on the arson charge. After exhausting his post-conviction remedies in the Illinois state courts, Mosley filed a habeas corpus petition in federal court alleging ineffective assistance of

counsel at trial. The district court granted his petition and directed the State to release Mosley unless within 30 days it either filed an appeal or announced its intention to retry him. *U.S. ex rel. Mosley v. Hinsley*, 2011 WL 3840332 (N.D. Ill. Aug. 26, 2011). The State has appealed, and Mosley challenges our jurisdiction over this appeal.

We have jurisdiction to hear this appeal, and we agree with the district court's determination that the state court's summary dismissal of Mosley's ineffective assistance of counsel claim was contrary to federal law clearly established by the Supreme Court of the United States. The district court had to make that decision based on the record before the state courts. See *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011); 28 U.S.C. § 2254(d). The record before the state courts consisted of the original trial record and the affidavits of two potential alibi witnesses whom Mosley's defense lawyer did not call to testify at trial. We agree with the district court that if those affidavits are true, then Mosley's lawyer provided ineffective assistance.

That determination does not, however, entitle Mosley to the grant of his petition. We also must ask whether the affidavits are in fact true, and whether there is other evidence relevant to the lawyer's decision not to call those witnesses and the prejudice that might have resulted. The district court heard additional evidence that contradicted the affidavits, but the court did not make findings on the conflicting evidence. The court believed that *Cullen v. Pinholster* prohibited consideration

of that evidence in deciding whether Mosley's conviction was actually unconstitutional. The district court read *Pinholster* too broadly. *Pinholster* limits a district court to consideration of the state record in deciding under § 2254(d)(1) whether a state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law . . . ." Where a district court properly finds that a state court's decision was contrary to or involved an unreasonable application of clearly established federal law, it must still answer the question underlying § 2254(a): whether a petitioner is actually "in custody in violation of the Constitution or laws or treaties of the United States." *Pinholster* does not confine a district court's decision on that ultimate question under § 2254(a) to a limited state court record. A state court's mistake in summarily rejecting a petition, *i.e.*, without fully evaluating conflicting evidence on disputed factual issues, does not necessarily mean the petitioner is ultimately entitled to relief.

The basic point is familiar from ordinary civil cases. If a trial court has erroneously granted summary judgment to one side in a civil case, that error does not necessarily mean that the other side is entitled to judgment in its favor. Similarly here, relevant evidence was never presented to the state court before it summarily, and erroneously, dismissed the petition. The new evidence must be considered to decide the ultimate merits of the petitioner's claim. We vacate the district court's grant of Mosley's petition and remand for an evaluation of whether Mosley's counsel was in fact constitutionally

ineffective. In making that evaluation, the district court shall consider any relevant evidence, whether it was presented to the state court or not. The district court should exercise its discretion in deciding whether to review the evidence the court heard in its prior evidentiary hearing, to hold a new evidentiary hearing, or both.

I. *Appellate Jurisdiction*

Before addressing the merits, we must consider our jurisdiction over this appeal. Mosley argues that this court lacks jurisdiction because there is actually no pending appeal to decide. When the district court granted Mosley's petition for a writ of habeas corpus, its opinion ordered the State of Illinois to release Mosley from custody unless, within 30 days from the entry of that opinion, the State announced its intention to retry Mosley or filed its notice of appeal. The separate Rule 58 judgment accompanying the order, however, omitted the 30-days language. It said only: "IT IS HEREBY ORDERED AND ADJUDGED that the court grants Christopher Mosley's petition for a writ of habeas corpus." After the district court denied the State's Rule 59 motion to alter or amend the judgment, the State filed a timely notice of appeal.

Shortly thereafter, the State noticed that the order and the judgment did not contain the same language. On motion by the State, we remanded the case to the district court for the limited purpose of modifying the judgment *nunc pro tunc* to bring it into line with the

district court's opinion. On February 3, 2012, the district court entered an amended judgment *nunc pro tunc* to conform the judgment to the opinion. *Nunc pro tunc* is a Latin phrase that means "now for then." A judge can issue a *nunc pro tunc* order to change records to reflect what actually happened, though not to rewrite history. *Justice v. Town of Cicero*, 682 F.3d 662, 664 (7th Cir. 2012).

Although the State had filed a timely notice of appeal from the district court's original judgment, it did not file a new notice of appeal from the February 3, 2012 judgment. Mosley argues that Circuit Rule 57 requires that a new notice of appeal be filed under these circumstances. Circuit Rule 57 provides:

> A party who during the pendency of an appeal has filed a motion under Fed. R. Civ. P. 60(a) or 60(b), Fed. R. Crim. P. 35(b), or any other rule that permits the modification of a final judgment, should request the district court to indicate whether it is inclined to grant the motion. If the district court so indicates, this court will remand the case for the purpose of modifying the judgment. Any party dissatisfied with the judgment as modified must file a fresh notice of appeal.

Mosley argues that the State is still "dissatisfied with the judgment as modified" and should have filed a new notice of appeal, so that its failure to do so bars our jurisdiction over this appeal. *Fogel v. Gordon & Glickson, P.C.*, 393 F.3d 727, 733 (7th Cir. 2004) (to challenge an amended judgment, appellant must file a new notice of appeal); Fed. R. App. P. 12.1 advisory committee note

("When relief is sought in the district court during the pendency of an appeal, litigants should bear in mind the likelihood that a new or amended notice of appeal will be necessary in order to challenge the district court's disposition of the motion.").

The State responds that because the district court amended its judgment *nunc pro tunc*, the original notice of appeal remains effective. The State relies on *Johnson v. Acevedo*, 572 F.3d 398 (7th Cir. 2009), and the related district court proceedings following a Circuit Rule 57 remand in that case. In *Johnson*, the district court's Rule 58 judgment was defective because it stated only that the writ of habeas corpus was "conditionally granted" without specifying the condition. *Id.* at 400. Upon learning of this jurisdictional issue, we "put the appeal in stasis while the parties returned to the district court and obtained a proper final judgment." *Id.*

To cure the jurisdictional defect in *Johnson*, the State filed in the district court a motion requesting an order stating the court's inclination to correct its judgment *nunc pro tunc*, which the district court granted. We granted the State's Circuit Rule 57 motion and remanded for the limited purpose of allowing the district court to correct the judgment *nunc pro tunc*. The State filed its motion to correct the judgment *nunc pro tunc*. The district court granted the motion and then entered an amended judgment. With the conclusion of that process, the parties had "obtained a proper final judgment" and the appeal could proceed.

The same procedure was followed here, and under the reasoning of *Johnson*, we have jurisdiction over this

appeal. As in *Johnson*, the district court's judgment in this case was inconsistent with its opinion because the judgment failed to include the conditions that could delay or prevent Mosley's release. After we had already taken jurisdiction of its appeal, the State noted the error and brought it to our attention. The district court stated its inclination to correct its judgment *nunc pro tunc*, that is, to retroactively amend its judgment through its inherent power, and we remanded for the limited purpose of allowing it to do so, but retained jurisdiction, as permitted by Rule 12.1(b) of the Federal Rules of Appellate Procedure. See Fed. R. App. P. 12.1 advisory committee note ("The court of appeals may instead choose to remand for the sole purpose of ruling on the motion while retaining jurisdiction to proceed with the appeal after the district court rules on the motion . . . ."). The district court's February 3, 2012 judgment thus had retroactive legal effect back to August 26, 2011, and this appeal remained pending. A new notice of appeal was unnecessary. The State's January 12, 2012 notice of appeal was therefore effective, and this Court has jurisdiction over this appeal.

II.  *The Merits of the Petition*

Our determination that we have jurisdiction over this appeal brings us to the merits: Mosley's petition for a writ of habeas corpus. The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as

amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Section § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This provision means that on habeas review, federal courts are usually limited to a deferential review of the reasonableness, rather than the absolute correctness, of a state court decision. *E.g.*, *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). For purposes of reasonableness review, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

Where the state court's decision is "contrary to" federal law, that decision is not entitled to the usual AEDPA

deference and is therefore reviewed *de novo* with the reviewing court applying the correct legal standard. *Martin v. Grosshans*, 424 F.3d 588, 592 (7th Cir. 2005). A state court's decision is "contrary to" clearly established federal law where it is "substantially different from the relevant precedent" of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Federal review of a claim governed by § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S. Ct. at 1398. "It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court." *Id.* at 1399. Thus, under § 2254(d)(1), "evidence later introduced in federal court is irrelevant." *Id.* at 1400. If § 2254(d) does not bar relief, then an evidentiary hearing may be needed. *Id.* at 1412 (Breyer, J., concurring in part and dissenting in part).[1]

---

[1] Before the Supreme Court decided *Pinholster*, the district court in this case had already held a two-day evidentiary hearing. After *Pinholster* was decided, the State brought the decision to the district court's attention, arguing that for purposes of § 2254(d), the district court had to determine whether the state court's decision was contrary to or an unreasonable application of federal law based only on the evidence available to the state court when it made its decision. The district court agreed with the State and disregarded the evidentiary hearing when conducting its § 2254(d) analysis. Mosley, the State, and we agree that after *Pinholster*, the district court was correct to limit its review.

A.  *Factual and Procedural Background*

Mosley's claim is that his trial counsel was constitution-ally ineffective, which requires him to show that coun-sel's performance fell below an objective standard of rea-sonableness and he was prejudiced as a result. See *Strick-land v. Washington*, 466 U.S. 668, 687 (1984) (establishing the familiar two-part "performance" and "prejudice" test for ineffective assistance of counsel claims). Because Mosley's claim relates to the effectiveness of his trial counsel, we begin by summarizing the State's case against Mosley and the details of his bench trial, then the post-conviction state court proceedings, and then the district court proceedings.

1.  *State Court Conviction*

Mosley was a member of the Gangster Disciples street gang and sold drugs from the corner of 71st and Rhodes on the south side of Chicago. Marlo Fernando, a competitor of Mosley's, lived in an apartment building located at 7108 S. Rhodes and sold drugs out of her second-floor apartment. In June or July 1997, Mosley told Fernando that she would have to pay "taxes" to the Gangster Disciples since she was selling drugs out of the building. After Fernando refused, her car window was smashed. Fernando demanded reimbursement for replacing the window from Mosley, who told her she would be paid but only if she stopped selling drugs. When Fernando did not receive money for her window, she began calling the police every time she saw Mosley and his friends in front of her building.

On August 15, 1997, at around 10:30 p.m., fire was set to Fernando's apartment building. The fire killed one resident of the building, Zulean Wilson. The fire was arson, so Wilson's death was murder. Expert testimony at trial established that gasoline was poured on stairwell doors located on the building's second floor and was lit with a match or a cigarette lighter. Mosley was arrested and charged with murder and arson based on a theory of accountability. Under Illinois law, Mosley was "accountable" for the murder and arson if, either before or during the commission of the offense, he solicited, aided, abetted, agreed, or attempted to aid another in the planning or the commission of the offense. 720 ILCS 5/5-2; *People v. Perez*, 725 N.E.2d 1258, 1264 (Ill. 2000). The State's theory was that Mosley had ordered two younger gang associates, then 14 and 13 years old, to set the building on fire.

At Mosley's trial, Fernando testified that after she began calling the police about two weeks before the fire, she heard Mosley say on at least five occasions that he was going to kill her. Earlier on the day of the fire, Fernando testified, she heard Mosley say he was going to "kill that B." Then immediately before she realized her building was on fire, she heard Mosley say "burn this motherfucker down." Nailal Ledbetter, a friend of Fernando's, testified that she was at Fernando's apartment on the evening of the fire. According to Ledbetter, when the fire started between 10:00 and 10:30 p.m., Mosley ran past the window, looked up and said, "burn this motherfucker down." Officer Robert Tovar testified that Mosley, after being brought into the police

station the day after the fire, admitted that he said "let it burn" before he saw people being injured as a result of the fire.

The sole defense witness was Ishi Coward. She testified that on the evening of the fire, she, Mosley, and a group of people were in the schoolyard at 70th Street and Rhodes Avenue between 7:00 and 7:30 p.m. She testified that Mosley was in the schoolyard the entire time until the fire occurred at about 10:30 p.m. When she, Mosley, and the others saw a fire at the building, they all ran across the street. Coward testified that she never heard Mosley tell anyone to burn the building down or to let the building burn.

The judge found Mosley guilty of first-degree murder and aggravated arson based on accountability, and sentenced him to consecutive prison terms of 60 and 15 years, respectively. Mosley appealed his convictions, which were affirmed on February 6, 2002. Mosley did not seek further direct review of his convictions.

### 2. *Post-Conviction State Court Proceedings*

Five years after the fatal fire, on September 5, 2002, Mosley filed a post-conviction petition in state court, pursuant to the Illinois Post-Conviction Hearing Act of 1998, 725 ILCS 5/122 *et seq.*, claiming that he was denied the effective assistance of trial counsel. Mosley alleged that his counsel was ineffective for failing to present the testimony of two alibi witnesses, Keely Jones and Sharon Taylor. In support of his petition, Mosley attached affidavits from Jones and Taylor.

Jones stated that on August 15, 1997, she arrived at the schoolyard at about 7:45 or 8:00 p.m. and met with several people, including Mosley. The group had been there a couple of hours when they heard someone shouting about a fire and they saw the building was on fire. Everyone ran across the street to the building to see if they could help, and Mosley assisted some of the people in the fire to safety. When Jones learned a couple of days after the incident that Mosley was arrested in connection with the fire, she went to visit him and was told he was accused of telling someone to burn the building down or of saying to let the building burn. Jones told Mosley that she would testify on his behalf, and Mosley gave Jones his attorney's contact information. Jones was unable to reach the attorney by phone but spoke with him on three separate occasions in the courtroom, telling him that she would testify for Mosley. Mosley's attorney told her that he would need her to testify, but he never contacted Jones and never called her as a witness even though she was present for Mosley's trial.

Sharon Taylor's apartment was directly above Fernando's. Taylor stated in her affidavit that she was in her apartment sitting on a couch by an open window with her son. She saw Mosley and a group of people running from the schoolyard yelling that the building was on fire, but she never heard Mosley tell someone to burn down the building. Mosley helped people to safety, including her son, whom Taylor dropped into Mosley's arms from her window. Taylor later learned that Mosley was arrested for the fire and that he was

accused of telling someone to burn down the building or saying to let the building burn. Taylor stated that the allegations were not true because she witnessed Mosley run across the street from the schoolyard with other people. Taylor suggested to Mosley that she testify on his behalf, and he gave her his attorney's contact information. She was unable to reach the attorney by phone, but approached him in court and told him that she would like to testify for Mosley. The attorney assured Taylor that she would be called as a witness, but she was never called to testify even though she was present during Mosley's trial.

After reviewing the trial record and the affidavits of Jones and Taylor, the Illinois trial court summarily denied Mosley's post-conviction petition as frivolous and without merit, finding that Mosley's attorney did not call Jones and Taylor as a matter of trial strategy and that if they had been called to testify, the result of the trial would not have been different.

Mosley appealed that ruling, and, after reviewing *de novo* the ineffective assistance of counsel claim, the Illinois Appellate Court affirmed. On the performance prong, the appellate court found that the trial attorney's decision not to call Taylor and Jones as alibi witnesses was reasonable and a matter of trial strategy. The appellate court also found that Mosley had failed to satisfy the prejudice prong of *Strickland*, "as the record shows that the outcome of the trial would not have differed if Jones and Taylor had testified." Mosley's petition for leave to appeal to the Illinois Supreme Court was denied without opinion.

### 3. *Federal Habeas Proceedings*

Mosley then filed a petition for writ of habeas corpus in the federal district court, again asserting ineffective assistance of counsel, and the district court held an evidentiary hearing. Shortly after that hearing, the Supreme Court issued *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), which the State argued required the district court to confine its review to the record before the state court. The district court accepted this argument and disregarded the evidence from the evidentiary hearing, limiting its analysis to the state trial record and the affidavits from Jones and Taylor, for that was the evidence available to the state court when it reviewed Mosley's ineffective assistance of counsel claim. *Mosley*, 2011 WL 3840332, at *1 n.2.

Based on that review, the district court determined that Mosley's claim met the requirements of § 2254(d) in two ways. On the performance prong of *Strickland*, the district court determined that it was unreasonable for the state court to find that trial counsel's decision not to call Jones and Taylor was a matter of trial strategy. On the prejudice prong, the district court found that the state court's decision was contrary to established Supreme Court precedent because it required Mosley to show that the outcome would have been different, rather than only a "reasonable probability" of a different outcome required under the *Strickland* standard. Thus, the district court conducted a *de novo* review of the prejudice inquiry and determined that there was a reasonable probability that, but for the unprofessional

errors of counsel, the outcome of the trial would have been different.

The State has appealed the district court's grant of Mosley's habeas petition. We review *de novo* the district court's decision to grant habeas relief. *Suh v. Pierce*, 630 F.3d 685, 690 (7th Cir. 2011).

B.  *§ 2254(d)*

Our first task is to determine whether the Illinois Appellate Court's rejection of Mosley's ineffective assistance of counsel claim was either "contrary to, or involved an unreasonable application of" the federal law clearly established by the Supreme Court in *Strickland v. Washington*. See 28 U.S.C. § 2254(d)(1). To demonstrate ineffective assistance under *Strickland*, a prisoner must show both that counsel's performance was deficient and that the prisoner was prejudiced as a result. 466 U.S. at 687.

1.  *Performance*

The performance standard provides significant latitude for permissible attorney conduct, and a prisoner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks omitted). If the prisoner has identified specific errors or omissions, the court must determine "whether, in light of all the circumstances,

the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. In its post-conviction review of Mosley's case, the Illinois Appellate Court concluded that trial counsel's decision not to call Taylor and Jones as alibi witnesses was reasonable and a matter of trial strategy because (1) their testimony would have been cumulative to that of Ishi Coward and (2) their testimony would have bolstered the state's case against Mosley on a theory of accountability by reinforcing the fact that he was across the street when the fire began.

The state court's analysis was an unreasonable application of *Strickland* for two reasons. First, on the limited record before the state courts, it was unreasonable to find summarily that trial counsel chose not to call Jones and Taylor as a matter of strategy. According to their affidavits, which were treated as true for purposes of the state courts' summary disposition, Mosley's lawyer never even interviewed them to learn what they might say. On that limited record before the state courts, the courts had to assume the lawyer was not aware of the specifics of their potential testimony. To avoid the inevitable temptation to evaluate a lawyer's performance through the distorting lens of hindsight, *Strickland* establishes a deferential presumption that strategic judgments made by defense counsel are reasonable. 466 U.S. at 690-91. But the presumption applies only if the lawyer actually exercised judgment. See *id*. ("strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on in-

vestigation"). The consequences of inattention rather than reasoned strategic decisions are not entitled to the presumption of reasonableness. *Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005); *Wiggins v. Smith*, 539 U.S. 510, 533-34 (2003). If, as Jones and Taylor claimed in their affidavits, Mosley's lawyer never found out what their testimony would be, he could not possibly have made a reasonable professional judgment that their testimony would have been cumulative or bolstered the State's case and could not have chosen not to call Jones and Taylor as a matter of strategy.

It was also unreasonable to find that Jones's and Taylor's testimony would have been cumulative and bolstered the State's case on a theory of accountability. Evidence is cumulative when it "goes to prove what has already been established by other evidence*." Smith v. Secretary of New Mexico Dep't of Corrections*, 50 F.3d 801, 829 (10th Cir. 1995); *Watkins v. Miller*, 92 F. Supp. 2d 824, 837 (S.D. Ind. 2000). Whether evidence is cumulative or not is a particular type of problem in evaluating the probative value of evidence, and it requires judgment. Evidence that provides corroborating support to one side's sole witness on a central and hotly contested factual issue cannot reasonably be described as cumulative. See, *e.g.*, *United States v. Vickers*, 442 Fed. App'x 79, 84 (5th Cir. 2011); *United States v. Stevens*, 277 Fed. App'x 898, 900-01 (11th Cir. 2008); *Vasquez v. Jones*, 496 F.3d 564, 576 (6th Cir. 2007); see generally *Arizona v. Fulminante*, 499 U.S. 279, 299 (1991) (second defendant's confession was not merely cumulative of first defendant's confession where they could reinforce and corroborate each other).

Here, Mosley's location when the fire was started was the critical issue in the case. Fernando testified that Mosley was underneath her window, ordering the two younger boys to burn down the building. According to their affidavits, Jones and Taylor would have testified that Mosley was in the schoolyard across the street. That testimony would not have been cumulative to the testimony of Ishi Coward, who was confused by the trial judge's questioning and seemed to testify (incorrectly) at one point that no one from the schoolyard, including Mosley, ever left to go to the burning building. "[T]estimony of additional witnesses cannot automatically be categorized as cumulative and unnecessary." *Crisp v. Duckworth*, 743 F.2d 580, 585 (7th Cir. 1984). Where, as here, the location of the defendant is critical to the case and there were problems with the testimony of the sole alibi witness, additional witnesses may well be critical for effective representation. See, *e.g.*, *Washington v. Smith*, 219 F.3d 620, 634 (7th Cir. 2000) (finding counsel's failure to investigate and call additional witnesses was deficient due in part to the fact that the one alibi witness who was called had questionable credibility because of prior convictions); *Montgomery v. Petersen*, 846 F.2d 407, 411-15 (7th Cir. 1988) (finding counsel ineffective for not calling additional, disinterested alibi witnesses not subject to the same impeachment as family members).

The state court said that Jones's and Taylor's testimony "would have reinforced that defendant was across the street from the fire at the time that it occurred, thereby strengthening the State's case against him based on

accountability." That determination was not reasonable. As the district court correctly noted, it is exactly the ability of Jones and Taylor to place Mosley across the street (and not under Fernando's window ordering the boys to set the fire) that could have made a difference. The lynchpin of the prosecution's case, tying Mosley to the actions of the younger boys, was the "burn this motherfucker down" comment that Fernando and Ledbetter claimed to have heard. To say that the state trial judge relied heavily on that comment would be an understatement — he quoted it numerous times in pronouncing guilt and sentencing Mosley. When discussing defense counsel's assertion that any statement made by Mosley was made after coming upon a fire already set, the judge specifically found that Mosley was below Fernando's window before the fire was set and that the comment was indeed a directive to the two boys. Additional witnesses placing Mosley across the street and not in front of the building at the time the fire was set would have bolstered the defense's theory, not the prosecution's.

Because, according to the affidavits that had to be taken as true in the state courts' summary disposition, trial counsel failed even to interview Jones and Taylor to learn the content of their potential testimony, it was unreasonable for the state appellate court to find summarily that trial counsel made a strategic decision not to call them as witnesses. In addition, it was unreasonable for the state appellate court to find summarily that their potential testimony would have been cumulative or would have bolstered the state's case.

2. *Prejudice*

To succeed on a *Strickland* ineffective assistance of counsel claim, Mosley must also show that he suffered prejudice as a result of his counsel's poor performance. The state court found that Mosley had not satisfied the prejudice prong. The problem is that the state court repeatedly misstated the controlling constitutional standard under *Strickland*. For example, citing *Strickland* itself, the Illinois Appellate Court set out the prejudice prong as "he must show that . . . he was prejudiced, that is, *the result of the proceedings would have differed* but for defense counsel's deficient performance." App. 32 (emphasis added). Later, the court reiterated: "As the trial court stated, had defense counsel called Taylor and Jones to testify, *the result of the trial would not have differed*, as they merely would have placed defendant across the street at the time of the offense." App. 36 (emphasis added).

The district court found that the state appellate court's decision was, in the terms of § 2254(d)(1), "contrary to" *Strickland* because it required Mosley to show that the result *would have* been different. We agree. *Strickland*'s prejudice prong actually requires that the defendant show "there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (emphasis added). This is not a mere detail or a quibble over word-smithing. The Supreme Court has used this precise discrepancy to illustrate how a state court's decision may be "contrary to" clearly established federal law under § 2254(d)(1):

> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. Take, for example, our decision in *Strickland v. Washington*, 466 U.S. 668 (1984). If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a "reasonable probability that . . . the result of the proceeding would have been different." *Id.* at 694.

*Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The state court's formulation in this case is also nearly identical in wording to one we have found "contrary to" *Strickland*: "but for defense counsel's unprofessional errors, the result of the proceeding would have been different." *Martin v. Grosshans*, 424 F.3d 588, 592 (7th Cir. 2005).

The State argues that this case is similar to *Sussman v. Jenkins*, 636 F.3d 329 (7th Cir. 2011), where we found that a state court's omission of the "reasonable probability" language was not contrary to *Strickland*. *Id.* at 359-60. As the State points out, the state courts here and in *Sussman* cited cases that in turn cited the proper stan-

dard, but that is where the similarities end. In *Sussman*, we held that it was clear from the state court's opinion that the state court did not believe that the evidence in question had a reasonable probability of altering the jury's verdict because it would have added little to the information received by the jury and would have been insignificant in impeaching the victim's credibility. *Id.* at 360. As a result, we found the use of a "shorthand" version of the *Strickland* prejudice test did not suggest that the state court employed the wrong standard. *Id.* In this case, though, the State's case against Mosley was far from unassailable, and "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with over-whelming record support." *Strickland*, 466 U.S. at 696. The state appellate court did not merely recite the wrong standard or use an inapt shorthand expression of the standard. It applied an incorrect and more onerous standard, and the difference may well have been deci-sive. Because the state appellate court's analysis was contrary to *Strickland*, this court reviews the prejudice prong *de novo*. *Grosshans*, 424 F.3d at 592.

So now we examine whether there was a reasonable probability the outcome would have been different, again limiting our review to the evidence before the state court. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "In weighing the effect of coun-sel's errors, the court must consider the totality of the evidence before the judge or jury. Consequently, a verdict or conclusion that is overwhelmingly supported

by the record is less likely to have been affected by errors than one that is only weakly supported by the record." *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001); see also *Stanley v. Bartley*, 465 F.3d 810, 814 (7th Cir. 2006) ("For the issue is not whether [petitioner] is innocent, but whether if he had had a competent lawyer he would have had a reasonable chance (it needn't be a 50 percent or greater chance) of being acquitted . . . .") (internal citation omitted).

Given the importance of Jones's and Taylor's potential testimony, at least according to their affidavits, and given that the evidence against Mosley was not over-whelming, we agree with the district court that if the Jones and Taylor affidavits are taken at face value, Mosley was prejudiced by his counsel's failure to call the two witnesses. Fernando, the primary witness against Mosley, had a clear motive to lie. She admitted she was involved in an ongoing dispute with Mosley over the sale of illegal drugs in the neighborhood. She also claimed that he and his fellow gang members were threatening her as a result of her refusal to pay the gang's "tax," and she called the police every time they gathered on the corner. Fernando had a strong motive for wanting Mosley incarcerated, so her credibility was suspect.

Further, Fernando's testimony regarding the "burn this motherfucker down" comment leads to more questions than answers. According to her testimony at trial, Fernando was in her apartment doing her hair with her friend. She went to her bathroom to get condi-

tioner for her hair when, she claimed, she heard Mosley say "burn this motherfucker down." This comment was the State's key piece of evidence for holding Mosley accountable for the younger boys' starting of the fire. She then testified that she walked from the bathroom to her living room, looked out an open window, and saw Mosley standing outside alone. She then looked up and saw a group of individuals running from the schoolyard on the corner yelling that the building was on fire. She opened her front door, saw smoke in the hallway, and saw the two younger boys running down the hall. The district court described the problem persuasively:

> Fernando's testimony presents an almost impossible factual scenario. First of all, if Fernando's version of events is to be believed, the following must have happened: in the time it took her to walk from her bathroom (where she allegedly heard Mosley say "burn the motherfucker down") to her living room, the two boys who lit the fire ran from below her window (where they were allegedly getting the directive from Mosley to start the fire) into the apartment building, ran up the stairs to the second floor, poured gasoline in the opening to the second floor hallway, and lit the fire. Fernando claimed that when she looked out her living room window and identified Mosley, she saw a group of people running towards her building from the schoolyard yelling that the building was on fire. So, in the time it took Fernando to walk from her bathroom to her living room, Mosley gave the directive, the boys ran into the build-

ing, threw the gasoline, lit the fire, and the fire pro-
gressed so that smoke was visible to the crowd of
people across the street in the schoolyard.

2011 WL 3840332, at *4. Not even Ledbetter's testimony
supports this version of the events: She testified that she
noticed "people were yelling fire, fire, fire," and *then* she
went to the window and saw Mosley standing below
"yelling burn this down."

The State argues that Mosley was not prejudiced by
trial counsel's decision not to call Jones and Taylor
because their evidence was not exculpatory — it could
not negate Mosley's guilt on an accountability theory.
Essentially, the State seems to be arguing that even if
Mosley had not made the statement at issue and was
indeed across the street at the time the fire was set, he
still would have been found guilty. We agree that if
the judge had rejected Fernando's and Ledbetter's testi-
mony, it still would have been possible to find Mosley
guilty under that reasoning, at least in theory. But the
theoretical possibility does not defeat Mosley's showing
of prejudice under *Strickland*. The trial judge gave
detailed reasons for finding Mosley guilty. Those com-
ments show that two findings were central to the
verdict: (1) Mosley was in fact under Fernando's window
before the fire was set, and (2) he in fact told the
two younger boys to "burn this motherfucker down."

The State also reiterates its argument that the testi-
mony of Jones and Taylor would have been merely cumu-
lative to that of Ishi Coward. As explained above
regarding the performance prong, Jones's and Taylor's

substantially similar testimony, at least as set out in their affidavits, would not have been cumulative. Coward's testimony was confused and was not corroborated. It is clear from the transcript that Mosley's location at the time the fire was set was the key issue to the judge. Additional alibi witnesses can add "a great deal of substance and credibility to [the defendant's] alibi." *Washington*, 219 F.3d at 634. Thus, if the Jones and Taylor affidavits are taken at face value, we agree with the district court that there is a reasonable probability that the result of the trial would have been different with the addition of two alibi witnesses to contradict Fernando's testimony and support Coward's. We affirm the district court's holding that, based on the state court record, Mosley has met the requirements of § 2254(d).

C.  *§2254(a)*

Mosley argues that the inquiry should end there: based on the evidence available to the state court, his counsel was ineffective and thus his habeas petition should be granted to give him a new trial. Mosley further argues (and the district court agreed) that the State waived its right to ask the district court to examine the evidence from the evidentiary hearing when it cited *Pinholster* for the proposition that new evidence could not be considered in deciding under § 2254(d) whether the state court's decision had been contrary to or an unreasonable application of clearly established federal law. The State did not mention in that filing that it

thought the new evidence should be considered if the district court found that Mosley had met the requirements of § 2254(d).

We disagree with this finding of waiver. Mosley's waiver theory assumes that the State needed to think through every possible implication of *Pinholster* to avoid waiver on any of the possible permutations and errors that might be made in the district court's ultimate decision. We believe that the theory expects too much of lawyers. The State's lawyers certainly did not invite or encourage the critical error that was made here. The State simply made no mention of considering the testimony from the evidentiary hearing if the district court found that the state court decision was contrary to or an unreasonable application of federal law.

Where a habeas petitioner shows that a state court's decision denying relief was contrary to or an unreasonable application of federal law, that will often show that the petitioner is entitled to relief, but the critical point here is that it will not do so always and automatically. Whether the petitioner is actually entitled to relief — whether under § 2254(a) he is in custody in violation of the Constitution or laws or treaties of the United States — is a separate question.

The procedures the state court used in reaching its erroneous decision must be considered in deciding how far the federal court's § 2254(d) finding reaches toward a final decision to grant or deny relief. Where a state court considered conflicting evidence and made factual findings, a district court may be able to decide the § 2254(a)

question based on its analysis of the state court's decision under § 2254(d). What happened here was very different. The state courts rejected Mosley's post-conviction petition summarily, assuming that the Jones and Taylor affidavits are true. The district court and we agree that the state courts erred in that decision, but that does not mean the Jones and Taylor affidavits are actually true or that they provide the complete picture of the facts relevant to Mosley's claim of ineffective assistance of counsel.

The situation here is similar to that when a trial court erroneously grants a defendant's motion for summary judgment. An appellate court will assume that the plaintiff's evidence was true and will reverse the summary judgment if there are genuine issues of material fact. The appellate court's reversal, though, usually will not order that a final judgment be entered in favor of the plaintiff, but will remand for a trial to resolve those disputed issues of fact.

In this case, the district court heard extensive evidence that could lead a reasonable finder of fact to reject many of the important elements of the Jones and Taylor affidavits. *Pinholster* did not instruct lower courts to ignore such evidence after determining that a state court's denial of relief was erroneous under the strict standards of § 2254(d)(1). In fact, in his separate opinion in *Pinholster*, Justice Breyer explained this problem and its correct solution:

> For example, if the state-court rejection assumed the habeas petitioner's facts (deciding that, *even if*

those facts were true, federal law was not violated), then (after finding the state court wrong on a (d) ground) an (e) hearing [under § 2254(e)] might be needed to determine whether the facts alleged were indeed true. Or if the state-court rejection rested on a state ground, which a federal habeas court found inadequate, then an (e) hearing might be needed to consider the petitioner's (now unblocked) substantive federal claim. Or if the state-court rejection rested on only one of several related federal grounds (*e.g.*, that counsel's assistance was not "inadequate"), then, if the federal court found that the state court's decision in respect to the ground in deciding violated (d), an (e) hearing might be needed to consider other related parts of the whole constitutional claim (*e.g.*, whether the counsel's "inadequate" assistance was also prejudicial). There may be other situations in which an (e) hearing is needed as well.

131 S. Ct. at 1412 (Breyer, J., concurring in part and dissenting in part). Mosley's situation fits neatly within Justice Breyer's first hypothetical. The state court evaluated Mosley's claim as supported by the Jones and Taylor affidavits and decided that even if those affidavits were true, Mosley had not stated a claim for ineffective assistance of counsel. The district court correctly found that the state court was wrong on two (d) grounds. (The state court's performance analysis was unreasonable and its prejudice analysis was contrary to clearly established federal law.) So Mosley cleared the § 2254(d) hurdle. That leaves Justice Breyer's

final and most basic question: are the facts alleged in the affidavits indeed true? To answer that question, the district court needed to hold an evidentiary hearing, as it did, but also to make findings on the disputed facts, which it did not.[2]

We thus vacate the district court's grant of Mosley's petition for habeas corpus. The district court already held an evidentiary hearing, and in light of *Pinholster*, it properly did not rely on that evidence in its § 2254(d) analysis. The State now urges that we consider the evidence presented at that hearing and make a § 2254(a) determination as to whether the allegations in the affidavits were true and, by extension, whether petitioner is in custody in violation of federal law (and urges that the answer to that question is no). Mosley, likewise, argues that if we were to consider the evidence presented at the evidentiary hearing, we would find that it supports his claim that he is entitled to habeas relief.

We decline the invitations to review the testimony from the evidentiary hearing and to make a § 2254(a)

---

[2] We agree with Mosley that "[t]he power of a court to grant a petition without an evidentiary hearing is unchanged by the Court's ruling in *Pinholster*." But that is beside the point. It is not *Pinholster* that compels the evidentiary hearing, but the fact that evidence relevant to the merits of Mosley's claim, and tending to undermine it, was never presented to the state court because of its summary dismissal of the claim. The district court is obliged to consider such evidence, like all other relevant evidence, before ruling on the merits of the claim.

determination ourselves. That would require the judges of this court to resolve issues of credibility and to act as triers of fact. We could not do that job on the basis of a written transcript. We instead remand the matter to the district court. Reviewing new evidence and making findings of fact is properly the responsibility of the district court. We must remand and direct the district court to consider the evidence presented in the evidentiary hearing, to hold a new hearing, or both, to determine whether Mosley's trial counsel was in fact constitutionally ineffective such that Mosley's petition for habeas corpus should be granted under § 2254(a).

III. *Conclusion*

The state appellate court's decision that Mosley was not denied effective assistance of counsel was contrary to and an unreasonable application of clearly established federal law. We affirm the district court's determination that Mosley has met the requirements of 28 U.S.C. § 2254(d). We vacate, however, the district court's grant of Mosley's habeas petition and remand for a determination of whether, based on new evidence not available to the state appellate court, Mosley's trial counsel was in fact constitutionally ineffective. The district court may rely on the evidentiary hearing held July 29 and August 3, 2010, or may hold a new evidentiary hearing, or both.

VACATED AND REMANDED